UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EBF HOLDINGS, LLC d/b/a EVEREST BUSINESS FUNDING,<br><br>        Plaintiff,<br><br>v.<br><br>ORBIT ENERGY & POWER, LLC and SEAN S. ANGELINI,<br><br>        Defendants. | Case No.: 1:22-cv-09873 |

## COMPLAINT

Plaintiff EBF Holdings, LLC d/b/a Everest Business Funding ("EBF" or "Plaintiff") files this Complaint and, for its cause of action against Defendants Orbit Energy & Power, LLC ("Orbit") and Sean S. Angelini ("Angelini") (collectively, "Defendants"), states as follows:

## PARTIES

1. EBF is a limited liability company organized and existing under the laws of the state of Delaware with offices located in New York and in Florida.

2. Orbit is a limited liability company organized and existing under the laws of the state of New Jersey. Upon information and belief, Orbit's sole member is Angelini, a resident of New Jersey, and its principal place of business is located in New Jersey. Orbit may be served with process by serving its registered agent, Angelini, at 106 E. Mantua Avenue, Wenonah, New Jersey 08090.

3. Angelini is a New Jersey resident who may be served with process by serving him at 106 E. Mantua Avenue, Wenonah, New Jersey 08090. Upon information and belief, Angelini is the president of Orbit.

1

## JURISDICTION AND VENUE

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a), as the parties are completely diverse from each other and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. This Court may exercise personal jurisdiction over Defendants because Paragraph 4.5 of the Agreements (defined below) contains a valid and binding forum selection clause, wherein the parties agreed that "[a]ny suit, action, or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if [EBF] so elects, be instituted in any court sitting in New York, (the 'Acceptable Forums')."  In addition, Defendants expressly "agree[d] that the Acceptable Forums are convenient to [them], and submit[ted] to the jurisdiction of the Acceptable Forums and waive[d] any and all objections to jurisdiction or venue." Agreements ¶ 4.5; *see also* Agreements at 2, "Agreement of Guarantor."

6. Venue in this District is likewise appropriate pursuant to Paragraph 4.5 of the Agreements.

7. Paragraph 4.5 of the Agreements also provides, in relevant part, that the Agreements "shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law." New York law thus governs this action.

## FACTUAL ALLEGATIONS

8. EBF provides revenue-based financing to various businesses by purchasing a portion of their future revenue stream or account receivables (the "Receipts") at a specified, discounted purchase price.

9. Upon information and belief, Orbit is in the business of providing energy and

power solutions, including solar paneling, water services, roofing, heating & cooling, and electrical services, to residential and business customers.

### A. The May Agreement

10. Orbit and EBF entered into a Revenue Based Financing Agreement dated May 19, 2022 (the "May Agreement"), by which EBF agreed to purchase $685,000 worth of Orbit's Receipts for a discounted purchase price of $500,000, less agreed upon fees. In exchange, Orbit agreed to make weekly payments to EBF until such time as EBF received the full amount of the purchased Receipts (the "Weekly Payments"). A true and correct copy of the May Agreement is attached hereto and incorporated by reference as **Exhibit A**.

11. In accordance with the May Agreement, Orbit was obligated to make the Weekly Payments from a single bank account into which Defendants agreed to deposit all of Orbit's Receipts (the "Account"). *Id.* at 2. The May Agreement required Defendants to grant EBF uninterrupted access to the Account for the purpose of debiting the Weekly Payments. *Id.* ¶¶ 1.1, 2.7, 2.16, 3.1.

12. As set forth in the May Agreement, the Weekly Payments were to be made in an amount equal to 15% (the "Specified Percentage") of Orbit's weekly future Receipts (the "Weekly Future Receipts"). *Id.* at 1-2. At the time of contracting, Orbit provided financial information and otherwise represented to EBF that $13,700 represented the Specified Percentage of its then-estimated Weekly Future Receipts. *See id.* Thus, the parties agreed that Orbit would remit weekly payments of $13,700 (the "Initial Weekly Payment") to EBF by ACH debit from the Account. *See id.*

13. As further set forth in the May Agreement, to the extent that the Initial Weekly Payment subsequently ceased to represent 15% of Orbit's weekly Receipts, Orbit was permitted

3

to request, and EBF was obligated to perform, a reconciliation of the Weekly Payment amount in order to adjust the same to more closely reflect Orbit's actual Weekly Future Receipts. *See id.* at 2.

14. To induce EBF to enter into the May Agreement, Angelini, among other things: (1) signed a Personal Guaranty of Performance (the "Guaranty") by which he guaranteed the prompt and complete performance (but not payment) of certain of Orbit's obligations under the May Agreement, *see id.* ¶ 5.1, and (2) made representations regarding Orbit's financial wherewithal, sales performance, and solvency.

15. More specifically, at the time of signing, Defendants represented in writing that Orbit was solvent and that it had annual sales of nearly $65 million, with monthly average sales of roughly $5.4 million. *See id.* at 1; *see also id.* ¶ 2.11.

16. Moreover, during a prefunding call with EBF, Angelini confirmed *inter alia* that bank and financial statements provided to EBF fairly represented the financial condition of the business, that Angelini would not interfere with EBF's right to collect the Weekly Payments, and that he had no reason to believe that Orbit would need to file for bankruptcy protection in the future (i.e., Orbit was not insolvent at the time and had no expectation of becoming insolvent in the future based on its current financial situation).

17. Defendants also made certain express representations and warranties in the May Agreement, including *inter alia*: (1) that "Seller's bank and financial statements, copies of which have been furnished to Purchaser, and future statements and other financial information that will be furnished hereafter at the request of Purchaser, fairly represent the financial condition of Seller at such dates[;]" *id.* ¶ 2.3, (2) that "Seller will not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take

4

any similar action that could interfere with Purchaser's ability to collect the Specified Percentage of the Future Receipts purchased under this Agreement, without Purchaser's prior written consent[;]" *id.* ¶ 2.7, (3) that "Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection[, and] that as of the date of this Agreement, it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it[;]" *id.* ¶ 2.11, and (4) that "Seller has good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Purchaser." *Id.* ¶ 2.13.

18. But for Defendants' representations regarding Orbit's sales performance, financial condition, solvency, and/or unencumbered title to the Receipts (other than with respect to EBF's claims thereto), EBF would not have entered into the May Agreement.

19. Additionally, as part of the May Agreement, Angelini signed an Agreement for Direct Deposits (ACH Credits) and Direct Collections (ACH Debits) authorizing EBF to collect the Weekly Payments by initiating ACH debits to the Account. Angelini also certified that he, individually, was an "authorized signer" on the Account. *See id.* at Appendix "A"; *see also id.* ¶ 2.16.

20. On or about May 19, 2022, pursuant to the terms of the May Agreement, EBF transferred to Orbit $496,655, an amount equal to the $500,000 Purchase Price less the agreed-upon contractual fees.

21. Orbit began performing on May 26, 2022, and EBF thereafter debited the Weekly

Payments each week through October 27, 2022.

22. However, on November 7, 2022, when EBF attempted to debit the Weekly Payment from the Account, it instead received an ACH return code R29. An ACH return code R29 is a standard code indicating that the holder of an account has informed the host bank that a debitor is not authorized to debit funds from that account. Upon information and belief, Orbit, acting through Angelini or another authorized individual, notified the bank that EBF was no longer authorized to debit funds from the Account, thus triggering the ACH return code that EBF received. In doing so, Orbit violated the terms of the May Agreement. This has prevented EBF from collecting the Receipts for which it had already paid.

23. On or about November 4, 2022, and again on or about November 7, 2022, Orbit informed EBF that it would not honor the terms of the May Agreement and would not remit any further funds to EBF. Orbit also represented and warranted at that time that it was facing "liquidity issues," but did not provide any financial information to support that claim—nor has Orbit ever availed itself of the reconciliation mechanism provided in the May Agreement.

24. Upon information and belief, these liquidity issues did not first arise on or about November 4 and existed at the time Defendants executed the May Agreement. Thus, Defendants' representations regarding Orbit's sales performance, financial condition, solvency, and/or unencumbered title to the Receipts were false at the time they were made.

25. At present, the balance due and owing under the May Agreement, consisting of unremitted receivables and costs/fees, equals not less than $375,255.

26. As of October 27, 2022, Orbit has remitted no further Weekly Payments despite, upon information and belief, continuing to generate Receipts through the operation of its business, which remains in good standing.

### B. The September Agreement

27. On or about September 8, 2022, Orbit and EBF entered into a second Revenue Based Financing Agreement dated September 8, 2022, by which EBF purchased an additional $552,000 of Orbit's Receipts for a discounted purchased price of $400,000, less agreed upon fees (the "September Agreement") (together with the May Agreement, the "Agreements"). The September Agreement was a separate transaction from the May Agreement, and the May Agreement, together with the rights and obligations contained therein, remained in force after execution of the September Agreement.

28. Pursuant to the September Agreement, Orbit agreed to make additional weekly payments of 15% of its Future Weekly Receipts to EBF until such time as EBF received the full amount of the Receipts purchased pursuant to the September Agreement (the "Weekly Payments"). A true and correct copy of the September Agreement is attached hereto and incorporated by reference as **Exhibit B**.

29. For the September Agreement, the parties agreed that the Initial Weekly Payment would be $11,040, an amount calculated based on updated financial information and other representations provided to EBF by Orbit in connection with the September Agreement. *Id.* at 2. Otherwise, with respect to the mechanics of the transaction, the September Agreement contained identical terms to the May Agreement regarding the timing and manner of payment, and it included the same reconciliation mechanism should the Initial Weekly Payment need to be adjusted. *See generally id.*

30. To induce EBF to enter into the September Agreement, Angelini, among other things: (1) signed a Personal Guaranty of Performance (the "September Guaranty") by which he guaranteed the prompt and complete performance (but not payment) of certain of Orbit's

7

obligations under the September Agreement, *see id.* ¶ 5.1-5.3, and (2) made representations regarding Orbit's financial wherewithal, sales performance and solvency.

31. More specifically, at the time of signing, Defendants represented in writing that Orbit was solvent and that it had annual sales of nearly $85 million, with monthly average sales of approximately $7 million. *See id.* at 1. Thus, Defendants represented that Orbit's business performance had improved since execution of the May Agreement.

32. Moreover, during a prefunding call with EBF, Angelini confirmed *inter alia* that the bank and financial statements provided to EBF fairly represented the financial condition of the business, that he would not interfere with EBF's right to collect the Weekly Payments, and that he had no reason to believe that Orbit would need to file for bankruptcy protection in the future.

33. Defendants also made certain express representations and warranties in the September Agreement, including *inter alia*: (1) that "Seller's bank and financial statements, copies of which have been furnished to Purchaser, and future statements and other financial information that will be furnished hereafter at the request of Purchaser, fairly represent the financial condition of Seller at such dates[;]" *id.* ¶ 2.3, (2) that "Seller will not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take any similar action that could interfere with Purchaser's ability to collect the Specified Percentage of the Future Receipts purchased under this Agreement, without Purchaser's prior written consent[;]" *id.* ¶ 2.7, (3) that "Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection[, and] that as of the date of this Agreement, it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it[;]" *id.* ¶ 2.11, and (4) that "Seller

has good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Purchaser." *Id.* ¶ 2.13.

34. But for Defendants' representations regarding Orbit's sales performance, financial condition, solvency, and/or unencumbered title to the Receipts (other than with respect to EBF's claims thereto), EBF would not have entered into the September Agreement.

35. Additionally, as part of the September Agreement, Angelini signed an Agreement for Direct Deposits (ACH Credits) and Direct Collections (ACH Debits) authorizing EBF to collect the Weekly Payments by initiating ACH debits to the Account. Angelini also certified that he, individually, was "an authorized signer on" the Account. *Id.* at Appendix "A"; *see also id.* ¶ 2.16.

36. Given the representations made by Defendants and relied upon by EBF in connection with the May Agreement, the then-current performance of Orbit with respect to the May Agreement, and the updated and improved financial information provided in connection with the November Agreement, all of which were material to EBF, EBF entered into the September Agreement with Defendants.

37. On or about September 8, 2022, pursuant to the terms of the September Agreement, EBF transferred to Orbit $396,655, an amount equal to the $400,000 Purchase Price less the agreed-upon contractual fees.

38. Orbit began performing on September 15, 2022, and EBF thereafter debited the Weekly Payments each week through October 27, 2022.

9

232497

39. However, on November 7, 2022, EBF received an ACH return code R29. Upon information and belief, the R29 code was triggered when Orbit, acting through Angelini or another authorized individual, intentionally placed a stop payment on the Account in violation of the terms of the September Agreement. This has prevented EBF from collecting the Receipts for which it had already paid.

40. As discussed above, on or about November 4, 2022, and again on or about November 7, 2022, Orbit informed EBF that it would not honor the terms of the May Agreement and would not remit any further funds to EBF due to "liquidity issues."

41. Upon information and belief, these liquidity issues existed at the time of the May Agreement, and Defendants thus effectively "doubled down" on their misrepresentations regarding Orbit's financial wherewithal at the time they executed the September Agreement. Indeed, Defendants represented that Orbit's financial situation had in fact *improved* in the period between May and September 2022. Therefore, Defendants' representations regarding Orbit's sales performance, financial condition, solvency, and/or unencumbered title to the Receipts were false at the time they were made.

42. At present, the balance due and owing under the September Agreement, consisting of unremitted receivables and costs/fees, equals not less than $480,075.

43. As of October 27, 2022, Orbit has remitted no further Weekly Payments despite, upon information and belief, continuing to generate Receipts through the operation of its business, which remains in good standing.

44. EBF is informed and believes, based on the sequencing of events as set forth above, that Defendants never intended to fully comply with the terms of the Agreements. In fact, it appears Defendants remitted Weekly Payments pursuant to the May Agreement for only so

long as it was necessary to induce EBF into entering into a second agreement (the September Agreement). This is evidenced by the fact that Defendants blocked EBF's ACH access to the Account less than two months after receiving the September funding in the amount of $400,000.

**FIRST CLAIM FOR RELIEF**

(ORBIT—BREACH OF THE MAY AGREEMENT)

45. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

46. The May Agreement is a valid and binding contract supported by valuable consideration.

47. EBF transferred to Orbit the agreed-upon purchase price required under the May Agreement.

48. Paragraph 3.1 of the May Agreement defines "Events of Default" to include the following events: "(a) Seller intentionally interferes with Purchaser's right to collect the Weekly Payment in violation of this Agreement; (b) Seller violates any term or covenant in this Agreement; [and] (c) Any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made[.]"

49. The May Agreement provides that, in the event of a default, "[t]he full uncollected Purchase amount plus all fees (including legal fees) due . . . will become due and payable in full immediately." *Id.* ¶ 3.2(A).

50. On or about November 7, 2022, Orbit (by and through its owner and sole member Angelini) defaulted under Paragraph 3.1(a) by intentionally placing a stop payment on the Account in violation of EBF's right to collect the Weekly Payments. The May Agreement provides for a reconciliation process to adjust the Weekly Payments but does not permit Orbit

unilaterally to block EBF's access to the Account.

51. Orbit also defaulted under Paragraph 3.1(c) by making false or misleading representations to EBF regarding its sales performance, financial condition, solvency, and/or unencumbered title to the Receipts of Orbit. As detailed above, prior to and at the time of contracting, Orbit represented that it was solvent, that its average monthly sales were $5.4 million, that its annual sales equaled $65 million, and that it possessed unencumbered title to the Receipts. *See id.* at 1; *see also id.* ¶ 2.11. Orbit's liquidity issues did not first arise on or about November 4 and were extant at the time Defendants executed the May Agreement. Thus, Plaintiff is informed and believes one or more of the above-described representations were false when made.

52. As a result of Orbit's breaches, EBF has suffered damages in the amount of $375,255, plus attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

(ORBIT—BREACH OF THE SEPTEMBER AGREEMENT)

53. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

54. The September Agreement is a valid and binding contract supported by valuable consideration.

55. EBF transferred to Orbit the agreed-upon purchase price, as required under the September Agreement.

56. Paragraph 3.1 of the September Agreement defines "Events of Default" to include the following events: "(a) Seller intentionally interferes with Purchaser's right to collect the Weekly Payment in violation of this Agreement; (b) Seller violates any term or covenant in this

232497

Agreement; [and] (c) Any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made[.]"

57. The September Agreement provides that, in the event of a default, "[t]he full uncollected Purchase amount plus all fees (including legal fees) due . . . will become due and payable in full immediately." *Id.* ¶ 3.2(A).

58. On or about November 7, 2022, Orbit (by and through its owner and sole member Angelini) defaulted under Paragraph 3.1(a) by intentionally placing a stop payment on the Account in violation of EBF's right to collect the Weekly Payments. The September Agreement provides for a reconciliation process to adjust the Weekly Payments but does not permit Orbit unilaterally to block EBF's access to the Account.

59. Orbit also defaulted under Paragraph 3.1(c) by making false or misleading representations to EBF regarding its sales performance, financial condition, solvency, and/or unencumbered title to the Receipts. As detailed above, prior to and at the time of contracting, Orbit represented that it was solvent, that its average monthly sales were $7 million, and that its annual sales equaled $85 million. *See id.* at 1, *see also id.* ¶ 2.11. Orbit's liquidity issues did not first arise on or about November 4 and were extant at the time Defendants executed the May Agreement. Orbit thus "doubled down" on misrepresentations made in May when negotiating the September Agreement by representing that its financial condition had, in fact, *improved* since execution of the May Agreement. Therefore, Plaintiff is informed and believes, one or more of the above-described representations were false when made.

60. As a result of Orbit's breaches, EBF has suffered damages in the amount of $480,075, plus attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

(ANGELINI, AS GUARANTOR—BREACH OF MAY GUARANTY)

61. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

62. Pursuant to the May Guaranty, and as consideration for the obligations undertaken by Orbit, Angelini personally guaranteed "prompt and complete performance" of certain of Orbit's specified obligations under the May Agreement, including the following: (1) "Seller's obligation to provide bank statements and other financial information that fairly represent the financial condition of Seller at such dates, within 5 business days after request from Purchaser;" May Agreement ¶ 5.1.1, and (2) "Seller's obligation to not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take any similar action that could have an adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent[.]" *Id.* ¶ 5.1.2.

63. In the event that Orbit failed to perform these obligations, the May Guaranty allows EBF to recover from Angelini "all of Purchaser's losses and damages and all remedies specified" in the May Agreement "without first seeking to obtain payment from Seller or any other guarantor, or any other guaranty." *Id.* ¶ 5.1.

64. Angelini breached Paragraph 5.1.2 of the May Guaranty by failing to guarantee the performance of Orbit's obligation to "not . . . take any similar action that could have an adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent." Specifically, Angelini breached the above-described provision by causing a stop payment to be placed on the Account in violation of EBF's rights.

65. Angelini also breached Paragraph 5.1.1 of the May Guaranty by failing to

guarantee the performance of Orbit's obligation to "provide bank statements and other financial information that fairly represent the financial condition of Seller at such dates." For reasons more fully articulated above, Angelini's representations that Orbit was solvent, that its average monthly sales were $5.4 million, and that its annual sales equaled $65 million were false when made. *See id.* at 1, *see also id.* ¶ 2.11.

66. As a result of Orbit's conduct, EBF has suffered damages in the amount of $375,255, plus attorneys' fees and costs.

67. Pursuant to the May Guaranty, Angelini is personally liable for the full amount of these damages.

## FOURTH CLAIM FOR RELIEF

(ANGELINI, AS GUARANTOR—BREACH OF THE SEPTEMBER GUARANTY)

68. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

69. Pursuant to the September Guaranty, and as consideration for the obligations undertaken by Orbit, Angelini personally guaranteed "prompt and complete performance" of certain of Orbit's obligations under the September Agreement, including the following: (1) "Seller's obligation to provide bank statements and other financial information that fairly represent the financial condition of Seller at such dates, within 5 business days after request from Purchaser;" Sept. Agreement ¶ 5.1.1, and (2) Seller's obligation to not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take any similar action that could have an adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent[.]" *Id.* ¶ 5.1.2.

70. In the event that Orbit failed to perform these obligations, the September

Agreement allows EBF to recover from Angelini "all of Purchaser's losses and damages and all remedies specified" in the September Agreement "without first seeking to obtain payment from Seller or any other guarantor, or any other guaranty." *Id.* ¶ 5.1.

71. Angelini breached the September Guaranty by failing to guarantee the prompt and complete performance of Orbit's obligation to "not . . . take any similar action that could have an adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent." Specifically, Angelini breached the above-described provision by causing a stop payment to be placed on the Account in violation of EBF's rights.

72. Angelini breached Paragraph 5.1.1 of the September Guaranty by failing to guarantee the performance of Orbit's obligation to "provide bank statements and other financial information that fairly represent the financial condition of Seller at such dates." For reasons more fully articulated above, Angelini's representations that Orbit was solvent, that its average monthly sales were $7 million, and that its annual sales equaled $85 million were false when made. *See id.* at 1, *see also id.* ¶ 2.11.

73. As a result of Orbit's conduct, EBF has suffered damages in the amount of $480,075, plus attorneys' fees and costs.

74. Pursuant to the September Guaranty, Angelini is personally liable for the full amount of these damages.

**FIFTH CLAIM FOR RELIEF**

(ALL DEFENDANTS—FRAUD/FRAUD IN THE INDUCEMENT)

75. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

76. Angelini, individually and on behalf of Orbit, and in connection with the

Agreements, made certain oral and written representations of fact regarding Orbit's sales performance, financial condition, solvency, and/or unencumbered title to the Receipts (other than with respect to EBF's interests thereto). For reasons more fully set forth above, Orbit's liquidity issues did not first arise on or about November 4 and were extant at the time Defendants executed the May Agreement and the September Agreement. Thus, each of Orbit's and Angelini's above-described representations were false when made.

77. These misrepresentations were made both verbally during prefunding telephone calls between Angelini and EBF prior to execution of the Agreements as well as in writing at the time the Agreements were executed. *See* May Agreement at 1, *see also id.* ¶¶ 2.11, 2.13. Angelini signed the Agreements on behalf of Orbit.

78. Defendants thus misrepresented Orbit's financial condition in connection with the Agreements, and by virtue of Angelini's ownership and control of Orbit, such misrepresentations were made by Defendants with the knowledge of their falsity and for the purpose of inducing EBF to rely on said statements when determining whether it would enter into the Agreements.

79. In entering into the Agreements, considering their terms, and evaluating the strength and condition of Orbit's business, EBF did in fact rely upon these Defendants' representations to its detriment.

80. As a result of Defendants' misrepresentations, EBF has suffered damages, including all actual damages, plus attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**

(ORBIT—BREACH OF FIDUCIARY DUTY)

81. EBF hereby incorporates by reference the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

17

82. Pursuant to Paragraph 2.17 of the Agreements, Orbit agreed to "hold the Specified Percentage of the proceeds of each sale of goods and services in trust for the benefit of" Orbit and to "promptly deliver the Specified Percentage to Purchaser as provided herein."

83. Orbit thus owed EBF a fiduciary duty to hold unremitted receivables due and owing under both Agreements in trust for the benefit of EBF.

84. Orbit acted in violation of this duty when it failed and refused to deliver the trust property to EBF by intentionally placed a stop payment on the Account in violation of EBF's rights under the Agreements. The Receipts to which EBF is entitled have thus not been remitted as required under the Agreements, and, upon information and belief, these Receipts have instead been misappropriated, spent, or otherwise disposed of in violation of EBF's rights.

85. As a result of Orbit's breach of fiduciary duty, EBF has suffered damages, including all actual damages, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, EBF prays for the following relief:

1. A judgment in favor of EBF against Orbit for breach of the May Agreement, breach of the September Agreement, for fraud/fraud in the inducement, and for breach of fiduciary duty;

2. A judgment in favor of EBF against Angelini for breach of the May Guaranty, the September Guaranty, and for fraud/fraud in the inducement;

3. An award of money damages against Defendants in an amount not less than $375,255 flowing from the May Agreement/May Guaranty;

4. An award of money damages against Defendants in an amount not less than $480,075 flowing from the September Agreement/September Guaranty;

232497

5. An award of punitive or exemplary damages flowing from the egregious and malicious conduct of Defendants;

6. An award equal to the amount of EBF's reasonable attorneys' fees, costs, and other legal expenses, in accordance with Paragraph 3.2 of the Agreements;

7. Such other and further relief as the Court may deem just and equitable.

DATED:  November 18, 2022

*/s/ William A. Delgado*
William A. Delgado
DTO LAW
27 E 28th Street - Office 15019
New York, NY 10016
Telephone: (213) 335-6999
Email:  wdelgado@dtolaw.com

Attorney for Plaintiff
EBF HOLDINGS, LLC

232497